IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILMER DERAS, et al.          :

                              :

     v.                       :    Civil Action No. DKC 09-0791

                              :

VERIZON MARYLAND, INC., et al.   :

                              :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this action involving alleged violations of the Fair Labor Standards Act and related state law claims is a motion to dismiss filed by Defendant Verizon Maryland, Inc. (Paper 32). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion will be granted in part and denied in part.

## I.  Background

The following facts are set forth in Plaintiffs' amended complaint. (Paper 24). Plaintiffs Wilmer Danilo Deras, Julio Garcia, Jose Candido Mejia, Oscar Deras, Naun Fuentes, Jesus Miranda, and Manuel Ramirez are laborers who installed underground fiber optic cables and performed related tasks on behalf of Defendants Verizon Maryland, Inc. ("Verizon"), Cablecom, LLC, Utilities Maldonado, Inc., Armando Moreno Maldonado ("Mr. Maldonado"), Marissa Rodriguez Rivera,

individually and d/b/a Communication Moreno Co., and unknown contractors of Verizon and/or Cablecom at various times from 2005 to 2007. Plaintiffs were hired by Mr. Maldonado, "an officer of Defendant Utilities Maldonado" who "held or implemented individual control over [its] day-to-day activities" (*id*. at ¶ 11), to perform this work at specified hourly rates. Each plaintiff accepted Mr. Maldonado's offer, thereby allegedly "forming an employment contract." (*Id*. at ¶¶ 17-23).

Prior to beginning work, Plaintiffs were required to attend "one or more trainings at a Verizon facility" regarding "OSHA-related regulations" and instructing them as to "how to perform their tasks related to installing cable and pipes." (*Id*. at ¶ 31). At the conclusion of the training session, Verizon tested Plaintiffs' knowledge of the training material and, upon successful completion, issued each Plaintiff a "photo-identification card labeled as a 'Safe Dig Certification Card' with instructions to call the Cablecom customer service hotline with any questions." (*Id*. at ¶ 32).

On a typical work day, Plaintiff Jesus Miranda, driving "Defendants' truck," picked-up the other laborers at their homes and transported them to "Defendant Maldonado's shop," arriving by 6:00 a.m. (*Id*. at ¶¶ 25, 28). Once there, Plaintiffs loaded tools and equipment into trucks and were divided into workgroups, given assignments, and dispatched to a worksite in

Maryland or Virginia. Plaintiff Wilmer Danilo Deras was responsible for driving "Defendants' vehicles" to the offices of Cablecom, in Laurel, Maryland, where he "pick[ed] up materials . . . and deliver[ed] them to the worksites." (*Id*. at ¶ 29). These materials included cables and boxes marked with the name "Verizon." At the worksites, Plaintiffs dug trenches, installed piping and fiber optic cable, and filled the trenches, planting sod, grass seed, and patching cement over the newly-laid underground cable. Mr. Maldonado was typically present at the work site each day and gave orders to Plaintiffs. Supervisors of Verizon and/or Cablecom were also present and "monitored Plaintiffs' work, g[a]ve orders to Plaintiffs if [Mr.] Maldonado was not present, and responded to any issues related to Plaintiffs' work as necessary, such as if there was an emergency or a gas or electric line was inadvertently cut." (*Id*. at ¶ 30). Plaintiffs worked until dark, at which point they were driven back to "the shop," unloaded and secured the equipment, and were driven home by Mr. Miranda. (*Id*. at ¶ 35). They typically worked twelve to sixteen hours per day, five or six days per week.

Mr. Maldonado and his wife, Defendant Marissa Rodriguez Rivera, whose responsibilities included signing Plaintiffs' paychecks, withheld Plaintiffs' pay for their first week of work, informing them that these wages "would be held 'in the

hole.'" (*Id.* at ¶ 37). Thereafter, Plaintiffs were typically paid for ten hours of work per day at their regular wage for each hour, despite the fact that they routinely worked more hours and over forty per week. On numerous occasions, Mr. Maldonado informed Plaintiffs that "he did not pay overtime compensation for work in excess of forty hours per week," and Plaintiffs never received pay at the overtime rate. (*Id.* at ¶ 41). Moreover, Mr. Maldonado allegedly "deducted state and federal payroll taxes from Plaintiffs' wages and failed to forward the taxes to the proper authorities." (*Id.* at ¶ 42). On or about December 21, 2007, "Plaintiffs' employment by Defendants terminated because Defendants had failed to pay Plaintiffs wages that were justly due and owing." (*Id.* at ¶ 39).

On or about December 18, 2008, Plaintiffs commenced this action in the Circuit Court for Montgomery County, Maryland, on behalf of themselves and others similarly situated, alleging, as to all defendants, violations of the Fair Labor Standards Act, the Maryland Wage and Hour Law, the Maryland Wage Payment and Collection Law, breach of contract, and unjust enrichment. (Paper 2).[1] On March 30, 2009, Cablecom removed the case to this

---

[1] The original complaint named "Verizon, Inc.," rather than "Verizon Maryland, Inc.," as a defendant.

court on the basis of federal question jurisdiction (paper 1) and, shortly thereafter, answered the complaint (paper 13).

On October 19, 2009, there having been no activity in the case for over six months, the court ordered Plaintiffs to file a status report. Plaintiffs filed a report one week later indicating that Utilities Maldonado, Mr. Maldonado, and Ms. Rivera had been served with the complaint, but failed to respond. (Paper 18). The report further stated that Verizon had not yet been served and that Plaintiffs suspected "Verizon Maryland, Inc.," rather than "Verizon, Inc.," was the proper name of the corporate defendant. The following day, the court ordered Plaintiffs to move for entry of default against the nonresponsive defendants or provide a report within thirty days as to why such motion would be inappropriate. (Paper 19). The court further directed Plaintiffs to show cause within fourteen days as to why the complaint should not be dismissed without prejudice as to "Verizon, Inc.," pursuant to Fed.R.Civ.P. 4(m) and Local Rule 103.8. Plaintiffs responded by filing a motion for leave to amend their complaint (paper 21) and a motion for entry of default against the nonresponsive defendants (paper 22). Upon obtaining leave, Plaintiffs filed their amended complaint on December 1, 2009, which differed from the original only in that it substituted Defendant "Verizon Maryland, Inc.," for "Verizon, Inc." (Paper 24). On February 18, 2010, Cablecom

answered the amended complaint (paper 34) and, on the same date, Verizon filed the pending motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (Paper 32). On February 23, 2010, the clerk entered default against Utilities Maldonado, Inc., Mr. Maldonado, and Ms. Rivera, d/b/a Communication Moreno Co. (Paper 37). Plaintiffs have not yet moved for default judgment.

## II. Standard of Review

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Nevertheless, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n. 3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted).

In its determination, the court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Iqbal*, 129 S.Ct. at 1950, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

## III. Analysis

### A. The Fair Labor Standards Act and Maryland Wage and Hour Law Claims

Verizon contends that Plaintiffs' claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, and the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.*, must be dismissed because the facts alleged in the amended complaint "fail to show the possibility of any employment relationship" such that it could be held liable. (Paper 32, Attach. 1, at 4). Plaintiffs oppose the motion, arguing that they have alleged facts sufficient to state a claim that Verizon, Cablecom, and Utilities Maldonado "operated as a joint and integrated employer," particularly in light of the remedial purpose of the FLSA. (Paper 42, at 13).

The FLSA mandates payment of a minimum wage for covered employees and payment at the overtime rate for each hour worked in excess of forty per week. *See Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (citing 29 U.S.C. §§ 206(a)(1), 207(a)(1)). The MWHL similarly requires that "employers pay the applicable minimum wage to their employees and, in [§§ 3-415 and 3-420 of the Labor and Employment Article], that they pay an overtime wage of at least 1.5 times the usual hourly wage for each hour over 40 that the employee works during one workweek." *Friolo v. Frankel*, 373 Md. 501, 513

(2003).  Indeed, "[t]he requirements under the MWHL mirror those of the federal law; as such, Plaintiffs' claim under the MWHL stands or falls on the success of their claim under the FLSA." *Turner v. Human Genome Science, Inc.*, 292 F.Supp.2d 738, 744 (D.Md. 2003).

To state a claim for failure to compensate under the FLSA, the plaintiff must allege facts that, if proven, would be sufficient to establish the existence of an employer-employee relationship. *See Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999).  Because the purpose of the Act is "'remedial and humanitarian,'" it is "interpreted broadly so as to effectuate its goals" of "'protect[ing] the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others.'" *Quinteros v. Sparkle Cleaning, Inc.*, 532 F.Supp.2d 762, 768 (D.Md. 2008) (quoting *Benshoff*, 180 F.3d at 140).  To that end, it "'contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.'" *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947)).  The Act defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  An

"employee," in turn, is defined as "any individual employed by an employer," *id.* at § 203(e)(1), and "employ" means "to suffer or permit to work," *id.* at § 203(g). Consistent with these broad definitions, "[t]he Supreme Court has instructed courts to construe the terms 'employer' and 'employee' expansively under the FLSA." *See Quinteros*, 532 F.Supp.2d at 768 (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *Rutherford Food Corp.*, 331 U.S. at 730)).

"Separate persons or entities that share control over an individual worker may be deemed joint employers under the FLSA." *Schultz*, 466 F.3d at 305. Pursuant to 29 C.F.R. § 791.2(b):

> Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees;
>
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled

by, or is under common control with the
                    other employer.

(footnotes omitted).

        In determining whether a joint employment relationship
exists, the court must "'take[] into account the real economic
relationship between the employer who uses and benefits from the
services of workers and the party that hires or assigns the
workers to that employer,'" *Schultz*, 466 F.3d at 306 (quoting
*Ansoumana v. Gristede's Operating Corp.*, 255 F.Supp.2d 184, 193
(S.D.N.Y. 2003)), and base its decision upon the "'the
circumstances of the whole activity,'" *id*. (quoting *Bonnette v.
Calif. Health & Welfare Agency*, 704 F.2d 1465, 1469-70 (9th Cir.
1983)).

        In *Schultz*, the Fourth Circuit reviewed the district
court's entry of judgment in favor of the defendant employers,
after a bench trial, upon finding that the plaintiffs were
independent contractors, not employees.  The court vacated and
remanded, holding that that "[t]he undisputed facts compel the
legal conclusion that [the defendant contractor and its
principal] were joint employers and that the [plaintiffs] were
their employees for purposes of the FLSA." *Schultz*, 466 F.3d at
301.  The court reasoned that case "fit readily within the third
example of joint employment listed in the regulation," but
explained that where the examples do not directly apply, courts

                                11

should "consider factors such as those listed in *Bonnette*, 704 F.2d at 1469-70, and *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 71-72 (2d Cir. 2003), in determining whether there are joint employers within the meaning of the Act and the regulation." *Schultz*, 466 F.3d at 306, n. 2.

Here, in arguing that it cannot be considered Plaintiffs' joint employer, and thus cannot be liable under the FLSA or MHWL, Verizon urges the court to employ the four-factor test set forth in *Bonnette*, 704 F.2d at 1470, and consider whether it "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." (Paper 32, Attach. 1, at 5). The court need not do so, however, because, as in *Schultz*, the instant case appears to fall squarely within the third example provided by the implementing regulation based on the facts alleged.

While it is not explicitly stated in the complaint, the parties' motion papers make clear that Verizon contracted Utilities Maldonado and Cablecom to install its fiber optic cable throughout the region. The complaint alleges that Mr. Maldonado, a principal of Utilities Maldonado, approached Plaintiffs and offered to employ them to perform this labor at specific rates, and that, upon Plaintiffs' acceptance of his

offers, they became employees.[2]  The well-pled allegations assert

that Mr. Maldonado made the hiring decisions and established

Plaintiffs' rates of pay; that Plaintiffs reported to work each

day at his "shop," where they loaded equipment and received

their assignments; that Mr. Maldonado routinely monitored and

directed their work at the worksites; and that, along with Ms.

Rivera, Mr. Maldonado issued (or withheld) their pay checks and

addressed their complaints regarding the amounts and rates of

pay they claimed were due.  Thus, the "economic realities" of

the case clearly suggest that Mr. Maldonado and/or Utilities

Maldonado were Plaintiffs' employers, as that term is defined by

the FLSA.  According to Verizon, the analysis should end at this

point, as "Plaintiffs' factual allegations pertain to the

existence of an employment relationship between themselves and

Defendant Maldonado," rather than Verizon.  (Paper 32, Attach.

1, at 8).

There can be no doubt, however, that Plaintiffs' work

"simultaneously benefit[ted]" Verizon as well.  *See* 29 C.F.R. §

791.2(b).  Plaintiffs allege that they were hired by Mr.

Maldonado for the exclusive purpose of laying Verizon's fiber

optic cable throughout the region, and that they were monitored,

_____

[2] Neither party has claimed that Plaintiffs were independent
contractors, rather than employees; indeed, Mr. Maldonado,
Utilities Maldonado, and/or Ms. Rivera would appear to be the
parties most likely to raise such a claim, but they are in
default.

and occasionally directed, by Verizon supervisors onsite each day. Moreover, before they were permitted to begin work, they were required to attend training sessions conducted by Verizon and, upon successful completion of a test, were provided "Safe Dig" certification cards, which, it may be inferred, they were required to obtain in order to work on the Verizon worksites. Under these facts, Mr. Maldonado and/or Utilities Maldonado and Verizon were "not completely disassociated" with respect to Plaintiffs' employment and could be "deemed to share control" of Plaintiffs, either "directly or indirectly, by reason of the fact that [Verizon] control[led] . . . the other employer," namely, Mr. Maldonado and/or Utilities Maldonado. 29 C.F.R. § 791.2(b).

In support of its motion to dismiss, Verizon relies heavily on Judge Williams' decision in *Quinteros*. There, the plaintiffs were subcontractors who worked, on a per job basis, on "special projects" that were occasionally offered by Sparkle Cleaning, Inc., a commercial cleaning service. *Quinteros*, 532 F.Supp.2d at 766. At some point, Sparkle contacted the plaintiffs to see if they were available to work on such a project at Regal Cinemas. The plaintiffs owned their own equipment and were free to accept or decline any job that Sparkle offered. They accepted the job, working overnight when the theaters were closed, at various Regal locations. When they were not

compensated for overtime wages, they filed suit against Sparkle and Regal under the FLSA.

After finding that the plaintiffs were employees of Sparkle, rather than independent contractors, the court turned to the question of whether Regal was a joint employer. The court first determined that Sparkle did not "neatly fit into one of the three categories" enumerated by 29 C.F.R. § 791.2(b), and thus considered the tests set forth in *Bonnette* and *Zheng*, as suggested by the Fourth Circuit in *Schultz*. *Id*. at 774. In considering those factors, Judge Williams concluded that Regal was not the plaintiffs' joint employer, reasoning as follows:

> While Plaintiffs work at various Regal Cinemas in Maryland, Virginia, and the District of Columbia, it is Sparkle, not Regal, who sends them to these locations as part of its contract with Regal. Their work is not directly dependent on the work they perform at Regal, but depends on where Sparkle[] sends them – in this case, it just happens that Plaintiffs work at Regal. Also, Plaintiffs allege that their work is overseen by Regal, but this is nothing short of a conclusory statement unsupported by sufficient facts in the complaint. Plaintiffs do not depend solely on the business of movie theaters for their work, but rather depend on the business generated from Sparkle Clean[ers] who directs them to work at places like Regal Cinemas.

Unlike the plaintiffs in *Quinteros*, the plaintiffs here were hired for the sole purpose of laying Verizon's fiber optic cable network and they worked exclusively on Verizon worksites.

There are no allegations in the amended complaint suggesting that they exercised the kind of independent control enjoyed by the plaintiffs in *Quinteros*; indeed, the equipment and supplies used by Plaintiffs were provided by Utilities Maldonado, Cablecom, Mr. Maldonado and/or Verizon. While their schedules and assignments were controlled directly by Mr. Maldonado, Verizon at least exerted indirect control over the time and manner in which their work was done. Moreover, Plaintiffs' allegations that Verizon supervisors monitored their work on a daily basis and occasionally gave orders, is not, in this case, a conclusory allegation unsupported by sufficient facts. Thus, *Quinteros* is distinguishable.

Here, Plaintiffs were essentially subcontractors hired by a contractor, Mr. Maldonado and/or Utilities Maldonado, which, in turn, was contracted by Verizon. Similar factual circumstances were recently considered in *Mendoza v. Essential Quality Constr., Inc.*, 691 F.Supp.2d 680 (E.D.La. 2010). There, the United States District Court for the Eastern District of Louisiana considered the claims of a number of construction workers who filed suit for unpaid wages under the FLSA against Essential Quality Construction, Inc., the subcontractor that hired them; Quang Nguyen, the principal of Essential Quality; and Harris Builders, LLC, the general contractor that hired Essential Quality. Similar to the instant case, the plaintiffs

there alleged that their work hours and assignments were set by Essential Quality and Nguyen, but that Harris "was on the job site . . . monitoring plaintiffs' work" and provided them with the construction materials necessary to do the job. *Mendoza*, 691 F.Supp.2d at 683. Like Verizon here, Harris moved to dismiss, alleging that it was "not a joint employer, nor does it have any employment or contractual relationship with the plaintiffs." *Id.* at 684.

In finding that Plaintiffs had alleged sufficient facts to support a claim that Harris was a joint employer under the FLSA, the court explained that although "a general contractor/subcontractor relationship does not establish joint employment, neither does the fact that such relationship exists preclude the possibility that the employees of the subcontractor are also the employees of the general contractor." *Id.* at 685 (citing *Quintanilla v. A & R Demolitina, Inc.*, 2005 WL 2095104 (S.D.Tex. 2005); *Zheng*, 355 F.3d at 74-75). It then employed the "economic reality" test set forth by the Fifth Circuit in *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324 (5th Cir. 1993), finding as follows:

> Applying the first factor of the economic reality test set forth by Circle C, i.e. the employer's right to control the work, plaintiffs' allegations that they were "jointly hired and employed" by Harris and Essential Quality and that Harris' superintendent monitored their work on a

daily basis, suggests that Harris had the
right to control the work of plaintiffs. As
for the second factor, i.e. the worker's
opportunity to influence his profit or loss,
plaintiffs allege that their rates of pay
were "determined by Quang 'John' Nguyen, and
approved by Essential Quality and/or Harris
Builders." Such would support a finding that
plaintiffs had little ability to influence
plaintiffs' profit or loss. Plaintiffs are
much more akin to wage earners toiling for a
living. With respect to the third factor,
i.e. the worker's investment in equipment
and materials, the assertion that the
defendants "provided plaintiffs with paint,
sheet rock, tape and other supplies to do
the job" suggests that plaintiffs'
investment in materials may have been
minimal. Finally, as to the last factors,
i.e. whether the service requires special
skills and the degree of permanence of the
working relationship, plaintiffs have not
stated whether or not their jobs involved
any special skills, nor have they alleged a
specific duration of employment, although
plaintiffs have stated that their work was
performed over a period of three months.

*Mendoza*, 691 F.Supp.2d at 685 (footnotes omitted). Those facts,

the court found, "suggest[ed] that an employment relationship,

as defined by the FLSA, may have existed between plaintiffs and

Harris." *Id.* It further explained that although "plaintiff[s']

allegations also suggest that Essential Quality may have

exercised greater control over plaintiffs than Harris, the Court

cannot determine at this stage whether this would preclude the

possibility of an employment relationship with the other." *Id.*

at 685-86.

Aside from the fact that Plaintiffs here have not set forth sufficient facts to establish that Verizon participated in the decision to hire them, the instant case appears to be materially indistinguishable. Considering the expansive definitions of "employer" and "employee" prescribed by the FLSA and the Act's remedial purpose, Plaintiffs' amended complaint has alleged facts sufficient to show that Verizon may have been a joint employer of Plaintiffs under the FLSA and MWHL.[3] Particularly at this nascent stage of the litigation, that is all that was required of them. Accordingly, Verizon's motion to dismiss the FLSA and MWHL claims will be denied.

### B. The Maryland Wage Payment and Collection Law Claim

Verizon's argument in support of dismissal of Plaintiffs' claim under the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code. Ann. Lab. & Empl. §§ 3-501, *et seq.*, consists solely of its claim that there was not an employment relationship between it and Plaintiffs. Even assuming that Verizon may be deemed to be Plaintiffs' employer under the MWPCL, however, Plaintiffs' amended complaint fails to state a claim for relief.

---

[3] Because the court finds that Verizon may be a "joint" employer, it does not consider whether Verizon, Cablecom, and Utilities Maldonado may also be "integrated" employers, to the extent that claim is distinct.

Unlike the FLSA and MWHL, the MWPCL "does not concern the amount of wages payable but rather the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment." *Friolo v. Frankel*, 373 Md. 501, 513 (2003); *see also McLauglin v. Murphy*, 372 F.Supp.2d 465, 474 (D.Md. 2004). In the third count of their amended complaint, Plaintiffs allege that "Defendants failed and refused to timely pay Plaintiffs' (and other similarly situated) wages within two weeks of termination of Plaintiffs' employment by Defendants," and that this was "not the result of a bona fide dispute." (Paper 24, at ¶¶ 58, 59). The factual section of the complaint, however, appears to allege that Mr. Maldonado and/or Ms. Rivera were responsible for payment of Plaintiffs' wages. The only allegations specifically naming Ms. Rivera, d/b/a Communication Moreno Company, assert that her "responsibilities included, inter alia, signing the Plaintiffs' paychecks," and that she and Mr. Maldonado "informed each Plaintiff that their first week's wages would be held 'in the hole.'" (Paper 24, ¶¶ 12, 37). Moreover, Plaintiffs allege that Mr. Maldonado "reported to [them] that he did not pay overtime compensation for work in excess of forty hours per week," and that he "deducted state and federal payroll taxes from Plaintiffs' wages and failed to forward the taxes to the proper authorities." (*Id.* at ¶¶ 41, 42). Although they allege, in conclusory

fashion, that "Defendants have failed and refused to pay Plaintiffs' earned wages, despite repeated requests to do so" (*id.* at ¶ 40), there are no specific allegations that Verizon was in anyway involved in paying Plaintiffs or withholding their wages, and all of the well-pled allegations as to this point suggest that it was not. Accordingly, Verizon's motion to dismiss the MWPCA claim will be granted.

## C. The Unjust Enrichment Claim

Insofar as the court finds that Verizon was not responsible for paying Plaintiffs' wages, it follows logically that Plaintiffs' claim for unjust enrichment cannot prevail. To state a claim for unjust enrichment under Maryland law, Plaintiffs must allege that (1) they conferred a benefit on Verizon, (2) that Verizon appreciated or had knowledge of that benefit, and (3) that it accepted or retained the benefit without the payment of its value. *See Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007). The amended complaint contains no specific allegations suggesting that Verizon did not pay for the benefit conferred upon it by Plaintiffs. As noted, the clear thrust of the complaint is that it was Mr. Maldonado and/or Ms. Rivera, not Verizon, that failed to pay Plaintiffs the wages they were due. Thus, the unjust enrichment claim will be dismissed.

### D.   The Breach of Contract Claim

Verizon contends that "Plaintiffs' breach of contract claim must fail because there is no allegation of the existence of a contract, employment or otherwise, between Plaintiffs and Verizon Maryland."  (Paper 32, Attach. 1, at 8).[4]  Plaintiffs counter by asserting that Verizon may be liable for breach of contract because it was a "joint or integrated employer" or, alternatively, that "[a]n employment contract was formed . . . because it is inferable from the facts alleged in the Amended Complaint that Defendants Cablecom, Utilities Maldonado, and Armando Maldonado formed the contracts operating in an agency capacity on behalf of Verizon Maryland."  (Paper 42, at 13-14).

The fourth count of the amended complaint asserts that "Defendants, or their agents, entered into employment contracts with Plaintiffs (and others similarly situated) by promising each Plaintiff certain rates of pay for work performed"; that "Defendants" then breached the employment contract "by failing to pay each Plaintiff for the work performed"; and that Plaintiffs suffered damages as a result.  (Paper 24, ¶¶ 61-63).  The factual allegations, however, specifically assert that Mr. Maldonado "offered to hire" Plaintiffs at specific rates of pay, and that each plaintiff's acceptance of his offer "form[ed] an

---

[4] Verizon further argues that the breach of contract claim is preempted by the FLSA claim.  Because the court will dispose of the motion on other grounds, it will not reach this claim.

employment contract." (Paper 24, at ¶¶ 17-23). Despite Plaintiffs' claim to the contrary, there are no well-pled allegations setting forth any basis for finding that Mr. Maldonado hired Plaintiffs while acting as an agent of Verizon; indeed, Plaintiffs have not pointed to any. Nor does the fact that Verizon might be considered a joint employer under the FLSA have any bearing on its liability for a common law breach of contract claim. Moreover, as noted in the foregoing discussion of the MWCPL and unjust enrichment claims, Plaintiffs have failed to allege that Verizon "fail[ed] to pay [them] for the work performed." Accordingly, Plaintiffs' breach of contract claim cannot be sustained.

## IV. Conclusion

For the foregoing reasons, Verizon's motion to dismiss will be granted in part and denied in part. A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

23